Despatch Oven Company v. Commissioner.
Despatch Oven Co. v. Commissioner
Docket No. 5332.
United States Tax Court
1945 Tax Ct. Memo LEXIS 134; 4 T.C.M. (CCH) 680; T.C.M. (RIA) 45219; June 28, 1945
Hayner N. Larson, Esq., for the petitioner. Ned Fischer, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined deficiencies in income tax and excess-profits tax for the years 1940 and 1941, as follows: Excess-Profits
Year
Income Tax
Tax
1940
$4,616.41
$4,008.52
1941
2,174.85
6,362.55
The error assigned for each year is the disallowance by respondent of $8,144 of the $20,000 salary paid by petitioner to its president and the disallowance of $10,655.20 of the $20,000 salary paid by petitioner to its vice-president and general manager. Findings of Fact Petitioner is a Minnesota corporation with principal office in Minneapolis, Minnesota. Its *135 returns for the taxable years in question were filed with the collector of internal revenue for the district of Minnesota. Its business is that of designing and building both low temperature and high temperature ovens for testing purposes and the heat treatment of various metals and materials. Petitioner was organized in 1913 to take over a sole proprietorship operated since 1902 by A. E. Grapp. The latter was an expert mechanic and electrician with unusual ability in designing and inventing necessary equipment to perform service mechanically. The small business organized by him in 1902 specialized in perfecting inventions brought in by others. His ability soon brought him recognition. Before the organization of petitioner he had designed and patented the first high-speed electric addressing machine, known as the Addressograph, the patent on which he later sold. He had also designed and built, under order from large milling concerns, special ovens for the testing of flour. By 1913 his business was regularly that of designing and building various types of electric ovens for laboratory and industrial use. In that year petitioner corporation was organized with a capital stock issue *136 of 90 shares of $100 par value, 80 of these being issued to Grapp for his business and 10 shares being issued to another individual for cash. In 1919, H. L. Grapp, a son of A. E. Grapp, was employed by petitioner. He was an expert in electric work and had had considerable experience in charge of a department in a manufacturing concern which was one of petitioner's competitors. Like his father, H. L. Grapp had a very marked inventive ability. During the period from 1920 to 1930, petitioner's business increased together with its reputation in designing and constructing needed types of industrial ovens. In 1930, petitioner's gross sales were $187,719.15. For that year, as in the preceding year, A. E. Grapp was paid a salary of $14,200 and H. L. Grapp a salary of $6,900. The year 1931 brought the depression as a result of which the company's gross sales were tremendously reduced. It had difficulty in surviving through the years 1931 to 1936. The Grapps, father and son, then devoted a great part of their time to experimental work and the devising of new types of equipment in connection with the manufacture of various kinds of commercial ovens. During this period the salaries paid by *137 petitioner to these two persons were considerably reduced. In 1937 conditions improved somewhat, petitioner's gross sales amounting to $243,133.90, and for that year A. E. Grapp was paid a salary of $12,520 and H. L. Grapp a salary of $10,576. In the following year gross sales fell off approximately 50 per cent and the salaries were reduced to $6,200 and $5,035, respectively. In the following year these salaries were reduced to $6,000 and $4,805, respectively. Near the close of the year 1939 conditions began to improve and the work done by the father and son in the past years in developing new types of furnaces and heat treatment of metals and materials began to bear fruit. The automobile companies, which had been using lacquer for paint work, began the use of baked-on-enamel for fenders and other surfaces. In other lines of industry demands arose for drying and heat treatment furnaces for various purposes and petitioner's business began to grow rapidly. Both of the Grapps had been granted various patents on furnaces or appliances in connection therewith, but no royalties have been paid them by petitioner. The business of petitioner is in building to individual specification the *138 furnace desired by the purchaser for a particular use and purpose. With the exception of certain laboratory electric furnaces, which constitute a small part of petitioner's business, each furnace it builds is for a distinct and separate purpose, one varying from another. There is no such thing as construction of furnaces to be held in stock and sold on order. Petitioner receives inquiries from various manufacturing concerns in practically all branches of industry relating to the construction of a furnace of certain capacity and temperature which will give a specified result in the treatment of a particular metal or material. The ovens are designed for both ferrous and nonferrous metals. They are there made harder or softened and toughened. Every order or inquiry means a special job of devising the furnace to meet the requirements, including the engineering work and testing for results. Both of the Grapps worked together in all these phases of the business including the designing of the units to be constructed and the actual building of them. A. E. Grapp was, in the years here in question, the president and treasurer of petitioner, and H. L. Grapp was executive vice-president and general *139 manager. They both, in addition to their engineering and administrative work, contacted the company's customers and assisted the sales agents in effecting sales and at times supervised the actual erection and testing of the furnace units on installation in the plant of the purchaser. The year 1940 saw a great increase in petitioner's business, gross sales increasing from $237,000 to $425,000, and for the year 1941 to $898,000. Petitioner, because of the large increase in business, attempted to obtain the services of additional heating engineers but was unable to do so. As a result a very unusual amount of work was thrown upon A.E. and H. L. Grapp, the latter at times working as much as 60 hours without sleep. It had for years been the practice of petitioner at the close of the year to hold a stockholders' and directors' meeting at which salaries for the ensuing year were fixed, with a proviso that such salaries would be adjusted if the work and business done during the year increased so as to justify it. For each of the years 1940 and 1941, a salary of $20,000 each was voted to and paid to H. L. and A. E. Grapp. These salaries were reasonable compensation for the personal services *140 actually rendered by these two individuals. Opinion Our finding that the salaries of $20,000 each, paid by petitioner to its president-treasurer and its vice-president-general manager for the years 1940 and 1941, were reasonable within the purview of section 23 (a) (1), I.R.C., resolves the issue here presented. We think this conclusion is fully justified on the record. Petitioner's business is rather unusual. The capital investment is small. The facts show that it is built around, and its success unquestionably attributable to, the unusual abilities of these two officers. Respondent, according to the statement of his counsel in argument, disallowed a portion of each of their salaries by reason of the fact that the increase for 1940 was very large as compared to the salaries paid them for the two preceding years. This, however, has been explained by the proof of the conditions existing in those years. Thus it was established that the low salaries then paid were due, not to a lessening in the services they rendered but to the inability of petitioner, because of depressed business conditions, to pay more. The action by respondent overlooks the fact that ten *141 years prior to the taxable years here in question, A. E. Grapp was being paid a salary of $14,200 when the gross sales of the company were only 20 per cent of their amount in 1941. Since certain adjustments of petitioner's income were made which are not at issue Decision will be entered under Rule 50.